IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ROBERT EARLS JR. AND DIANE EARLS THAT IS STORED AT PREMISES CONTROLLED BY NEST LABS | Case No. 7-24-mj-128 _____  **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Richard A. Miller, a Special Agent (SA) with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information from February 1, 2024, through March 5, 2024, associated with Diane Earls; Robert Earls Jr.; and the email addresses 2dianeearls@gmail.com, robertearlsjr@yahoo.com, and rjearlsjr@gmail.com that is stored at premises owned, maintained, controlled, or operated by Nest Labs, Inc. ("Nest"), a video surveillance platform that is an electronic communications service and/or remote computing service owned by Google LLC and headquartered at 3400 Hillview Avenue, Palo Alto, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Nest to disclose to the government copies of the information (including video content, and the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I have been employed as an FBI Special Agent since November 2003. I received initial training and instruction to become a Special Agent at the FBI Academy located in Quantico, Virginia, which included training concerning violations of the United States criminal statutes. I am currently assigned to the Richmond Division of the FBI, Roanoke Resident Agency. I am presently, and have been previously, assigned to investigate a variety of criminal and national security matters, to include violent crimes, gangs, crimes against children, international terrorism, domestic terrorism, economic crimes, and counter-intelligence investigations. Further, I have experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause. While serving within my capacity at the FBI, I have authored numerous search warrant applications concerning various federal criminal violations.

3.      The facts in this affidavit come from my own investigation, observations, training and experience, and from information obtained from other law enforcement officers and confidential witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1349 (Conspiracy to Commit Wire Fraud) 371 (Conspiracy); and 1956 and 1957 (Concealment Money Laundering and Conspiracy to Commit Money Laundering) [the "Target Offenses"] have been committed by Robert Earls, Diane Earls, and other identified and unidentified persons, including others who may have aided and abetted, or conspired with, the Earls. There is also probable cause to search the information further described in Attachment A, for the things described in Attachment B.

**JURISDICTION**

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

6.      On February 6, 2024, at approximately 8:00 p.m., Diane Earls advised police in Salem, Virginia, that her husband, Robert Earls, had been missing since approximately 10:00 a.m.  Diane Earls advised that she pinged Robert's phone in the vicinity of Lewis Gale Hospital in Salem, Virginia, and noted that he had no reason to be there.  A search of the location did not locate Robert or his car at that time.  On February 7, 2024, Diane Earls notified the Salem Police Department that she had located Robert's car at Lewis Gale and that it contained a concerning note inside.  She later advised that she had removed the car from the location.  A second search of the location resulted in Robert Earls's body being located in a locked bathroom with what appeared to be a self-inflicted gunshot to his head.  Salem police located several items in the vicinity of Robert Earls's body, including a handgun and an Apple iPhone and entered those items into evidence.

7.      Salem police conducted a death notification to Diane Earls at her residence located at 6768 Christopher Drive, Roanoke, Virginia.  Diane Earls advised that Robert Earls drove her to work on the morning of February 6, 2024, around 7:00 a.m. and that they spoke on the phone around 10:00 a.m. but that he did not seem distressed.  She checked his location around 12:30 p.m., and his phone was at Lewis Gale at that time.  Robert Earls's only health issues were a twitching eye and migraine headaches.  They had recently purchased a house in

Oak Island, North Carolina, and were planning to move there.    Their Roanoke house was currently for sale and had just been paid off.   She noted that Robert had "regular debt" but nothing out of control.   They did not have any recent disputes, but she noted that they had divorced in 2019.   Robert's brother had threatened to sue them, and they decided a divorce would help protect their assets from him.   Diane Earls had no idea why Robert Earls would harm himself.

8.       Salem police obtained the note that Robert Earls had left.   It consisted of a file folder that had "more inside" written on the tab and handwriting on the outside that read:

> 2/6/24
>
> Girls-I am so sorry
>
> Diane-Best Person Ever
>
> [Redacted name]-Best Grandson
>
> Brady-Best Friend Ever
>
> I love you all
>
> Please don't hate me
>
> I can't face you
>
> I am a coward
>
> May God have mercy on my soul
>
> Robert

9.       On the inside of the file folder, the left side read:

> 2/6/24
>
> [Redacted name]'s ashes are on the thing with my mirror and drawers. I
>
> can't have Brady but [Redacted name] will put [Redacted name]'s ashes in

with me.  Please don't throw all my good stuff away.  I love you all so much. R

The right side read:

2/6/24

This was not planned.  [VICTIM 1] made it have to happen yesterday afternoon.

10.    There was also piece of paper with the following handwritten on it:

Diane 2/6/24

[Redacted name] has file with instructions.  Please forgive me.  I can't do this any longer.  I alone ruined an incredible family and life.  Robert

11.    On February 20, 2024, the FBI interviewed VICTIM 1. This individual advised that Robert Earls was an investment advisor for a large brokerage service (hereinafter "BROKER"), through Earls's company, Southern Investment Strategies.  VICTIM 1 had known Robert Earls socially for many years. In 2015, VICTIM 1 agreed to transfer a joint trust account containing approximately $1.2 million to the BROKER into an account managed by Robert Earls.  VICTIM 1 and his sister (VICTIM 2), were the beneficiaries of this trust.  In return, Robert Earls promised VICTIM 1 an eight percent referral, which VICTIM 1 never received. VICTIM 1 never made an issue of this with Robert Earls because he was a friend and VICTIM 1 trusted him.  VICTIM 1 received statements in the mail from the BROKER for a time after the initial transfer, but they eventually became sporadic.   When VICTIM 1 inquired with Robert Earls about the account, Earls would show VICTIM 1 statements on the computer.  Robert Earls provided VICTIM 1 with login information to get access directly with the BROKER, but VICTIM 1 was never able to access his account.   When VICTIM 1 questioned Robert Earls

about this, Earls made a variety of excuses about system problems.  On numerous occasions, Robert Earls met with VICTIM 1 at the Earls residence to discuss the account.  VICTIM 1 also received periodic emails from Robert about the account.  VICTIM 1 advised that he would receive emails from Robert Earls's email account at the BROKER and from robertearlsjr@yahoo.com.

12.     During meetings at the Earls residence, Robert would provide spreadsheets of VICTIM 1's account at the BROKER showing growth in the account rather than statements from the BROKER.  Robert Earls told VICTIM 1 that Diane Earls, a Certified Public Accountant, had prepared the spreadsheets for VICTIM 1's account.  When VICTIM 1 would receive statements from the BROKER, he would notice that they differed from the amounts Robert was showing him in the spreadsheet.  When VICTIM 1 would ask about the discrepancies, Robert would again provide a variety of reasons, claiming, for example, that some of the money was in a sweep account.

13.     VICTIM 1 also noted that Diane Earls appeared to be knowledgeable about the spreadsheets provided to him by Robert Earls. On occasion, VICTIM 1 or Robert Earls would have some question about the spreadsheets, and Diane Earls would come and answer the question.

14.     In September 2023, VICTIM 1's sister (VICTIM 2) contacted Robert Earls to get a current statement on the joint trust account.  Instead of a statement, Robert Earls sent an informational brochure, similar to a prospectus.  After not getting a straight answer, VICTIM 2 hired a different financial advisor, who contacted the BROKER in early February 2024.  VICTIM 2 was expecting a balance of approximately $2 million; however, the BROKER advised the account balance was $271.  In addition, the BROKER indicated that the account was

opened with approximately $244,000, not the $1.2 million that was withdrawn from the previous investment company in 2015. After VICTIM 2 notified VICTIM 1 of this discrepancy, VICTIM 1 contacted Robert Earls and demanded an explanation. Also around early February 2024, VICTIM 1 wanted to do a partial withdrawal of his account at the BROKER. After repeated excuses, VICTIM 1 received a $5,500 transfer from Robert Earls, which appeared to come from Earls's personal account and not VICTIM 1's account at the BROKER. On February 5, 2024, the day before Robert Earls went missing, Robert Earls advised that he was almost finished with the statements, and VICTIM 1 replied that he was going directly to the BROKER at approximately 12:45 that day.

15.     After Diane Earls located the suicide note referencing VICTIM 1, she called VICTIM 1 about it. VICTIM 1 began to explain the financial discrepancies to Diane Earls, who seemed surprised and said she was sorry before ending the call.

16.     VICTIM 1 provided the FBI with copies of documentation regarding this matter. One of the documents is an account statement purportedly from the BROKER with an ending date of December 31, 2020, showing a balance of $1,973,295.74. There are several parts of the document that appear to have been altered, including the address of VICTIM 1, the dates of the statement, and the values of the investments. The statement notes that VICTIM 1's account executive is Robert Earls, Southern Investment Services, with an address at the Earls's residence. There is a computational error on one of the purported investments, and the total does not add up correctly. A second document appears to be a spreadsheet that is purported to be from January 15, 2021, also with a total current value of $1,973,295.74. A third document, which appears to be a spreadsheet dated August 6, 2021, has a total current value of $2,609,111.22.

17.     VICTIM 1 also advised that another individual, VICTIM 3, was approached by Robert Earls about a $50,000 investment.  VICTIM 1 vouched for Robert Earls, so VICTIM 3 made the investment.  After news of Robert Earls's suicide was circulated, VICTIM 3 checked his account at the BROKER and found that the balance was about $70.

18.     VICTIM 1 also referred his daughter, VICTIM 4, to Robert Earls.  In 2017, VICTIM 4 made her first investment.  VICTIM 4 eventually invested about $27,000 with Robert Earls.  In approximately July 2023, VICTIM 4 wanted to make a partial withdrawal.  Robert Earls ignored VICTIM 4's requests.  VICTIM 4 then contacted VICTIM 1's wife, who contacted Robert Earls directly.  Earls apologized and agreed to contact VICTIM 4 and resolve the matter.  Although he contacted VICTIM 4, he never sent the money she requested.  After repeated requests by VICTIM 1's wife, Robert Earls wrote VICTIM 1's wife a check from his personal account for $7,000. The check bounced when she tried to cash it.  After repeated requests, VICTIM 1's wife received a transfer into her account from an unknown source that was definitely not the BROKER.  After news of the suicide  circulated, VICTIM 4 contacted the BROKER.  The BROKER advised that they had no history of any deposits from VICTIM 4.

19.     VICTIM 1 advised that Robert Earls had paid for an expensive wedding for his daughter and has a $1 million house in Cape Cod.  Finally, VICTIM 1 noted that on or about February 11, 2024, VICTIM 1 and his wife saw Diane Earls taking papers out of Robert's car and giving them to Diane Earls's daughter and son-in-law.

20.     VICTIM 1 was re-interviewed on May 20, 2024, to identify checks that were deposited into Earls's Southern Investment Strategies account at MemberOne Credit Union. VICTIM 1 noted that it appeared that Robert Earls was stealing from a trust set up by VICTIM 1's father and a trust set up by VICTIM 1's mother based on the account the checks were written

from.  Both trusts had assets originally deposited at the BROKER.  Robert Earls would tell VICTIM 1 that he had a great investment opportunity and that he liquidated some of the assets in the accounts at the BROKER and electronically transferred the proceeds to bank accounts in the names of the two trusts at BB&T Bank (now Truist).  Robert Earls would then instruct VICTIM 1 to write a check out of the BB&T account to Southern Investment Strategies-(BROKER) and would pick the check up from VICTIM 1.  The check would then be deposited into the Southern Investment Strategies account at MemberOne, which was under the control of Robert Earls.  This happened dozens of times from 2014 until the account was depleted.  VICTIM 1 now believes that Robert Earls did this to launder the money so BROKER would only see money leaving the account and going to VICTIM 1 and not see the money eventually going to Earls.

21.     On April 18, 2024, the FBI interviewed a married couple who will be referred to as VICTIM 5 and VICTIM 6.  VICTIM 5 and VICTIM 6 were referred to Robert Earls by a mutual friend who is a CPA and will be referred to as Cooperating Witness 1 (CW1).  VICTIM 5 and VICTIM 6 rolled approximately $700,000 from their retirement plan into an IRA managed by Earls in approximately 2017.  VICTIM 5 and VICTIM 6 periodically met with Earls over the years and Earls would tell them that their account was worth over $1,000,000. Earls would show them spreadsheets purporting to show their investments.  He also persuaded VICTIM 5 and VICTIM 6 to invest an additional $125,000 with him and to make withdrawals that he asked them to send back to him in confusing circular transactions.  This appears to be similar to the scheme Earls used with VICTIM 1 to launder money from a BROKER account to himself.  VICTIM 5 and VICTIM 6 also persuaded their church to invest $12,000 with Earls.  VICTIM 5 and VICTIM 6 had been getting a statement from an affiliate of BROKER but did not know the current status of their account.  After Earls killed himself, VICTIM 5 and VICTIM 6 located a

different representative of BROKER, who told them these transactions were red flags and that it would take time to sort everything out.  To date, VICTIM 5 and VICTIM 6 do not yet know the extent of their losses.

22.    VICTIM 7 was interviewed by the FBI on April 18, 2024.  VICTIM 7 was also referred to Robert Earls by CW 1.  VICTIM 7 works for the Town of Stuart, Virginia, who sent checks to Earls for VICTIM 7's retirement.  After hearing of Earls's death, VICTIM 7 had the Town of Stuart run a report of checks that were paid to Earls doing business as Southern Investment.  From November 1, 2006, through January 2, 2024, the Town of Stuart paid Earls approximately $101,599 for the benefit of VICTIM 7.   In addition, VICTIM 7 sent Earls approximately $200,000 consisting of the proceeds from the sale of her mother's house and a transfer from another investment account.  She would periodically ask Earls for statements, but he would make a variety of excuses and not provide them.  She also made several withdrawals over the years where she would have to make numerous requests from Earls before she would finally get a check.  When she would finally get a check, it would be a handwritten check from Southern Investment Strategies.  She also sent Earls additional money over the years but did not keep track of how much or when.   After hearing of Earls's death, VICTIM 7 contacted BROKER, who advised they had no record of an account for her.

23.    CW 1 was interviewed by the FBI on April 18, 2024.  CW 1 met Earls in approximately 2002.   In approximately 2015, CW 1 began to distance himself from Earls because Earls was frequently drinking in excess and was showing off by spending lots of money. He would throw extravagant parties at his office, the Earls's residence, and at baseball games in Roanoke.   CW 1 referred several tax clients to Earls, and Earls would refer several of his investment clients, including VICTIM 1, to CW 1 for tax work.  In 2020 or 2021, CW 1 noticed

that VICTIM 1's trust had a large drop in taxable income.  When CW 1 asked Earls about this, Earls replied that he had converted the investments to annuities, which satisfied CW 1.  In hindsight, CW 1 noted that both Robert and Diane Earls were living well beyond their means. They frequently traveled to Boston to see their daughter and spent at least $100,000 on her wedding.  They also took expensive trips to Nantucket for New Year's Eve celebrations.  CW 1 is certain that Diane Earls was involved in the scheme to defraud Robert Earls's investors. Robert Earls would send CW 1 spreadsheets that Robert Earls said that Diane Earls had created. The spreadsheets were various client financial profiles that Robert Earls wanted CW 1 to review to see if they were understandable and reasonable.  CW 1 does not believe that Robert Earls had the technical savvy to complete anything like these spreadsheets on his own.  In addition, Diane Earls did a lot of the tax work for Robert Earls and sent CW 1 tax work she could not complete.

24.     VICTIM 8 and VICTIM 9 are a married couple living in Mississippi who were interviewed by the FBI on May 7, 2024.  VICTIM 8's mother was Diane Earls's cousin, and, at some point, Robert Earls began managing VICTIM 8's mother's investments.  VICTIM 8's mother died in 2010, and VICTIM 8 inherited the investments.  Robert Earls traveled to Mississippi and had VICTIM 8 sign numerous documents that VICTIM 8 could not recall and did not receive copies.  VICTIM 8 and VICTIM 9 told Earls that they wanted a safe investment that would earn some interest and believed he had invested in some sort of money market.  Over the years, VICTIM 8 would call or text Earls for statements or account updates.  He would tell VICTIM 8 and VICTIM 9 that the account was worth over $470,000 and promise to get them statements, before changing the subject.  VICTIM 8 also set up a monthly withdrawal from the account of a couple thousand dollars.  VICTIM 8 had to make numerous requests from Earls to get the statements and the checks, which would come to them in a FedEx envelope from

Roanoke.  Diane Earls texted VICTIM 8 that Robert Earls was dead.  After numerous attempts to

reach Diane Earls after receiving her text message, she told them to call BROKER to find out

about their account.  When VICTIM 8 and VICTIM 9 called the BROKER, they were advised

that they had no account for VICTIM 8 or VICTIM 9.

25.     The FBI interviewed VICTIM 10 on May 16, 2024.  VICTIM 10 has known

Robert Earls for approximately 38 years and rolled his employer retirement account worth about

$140,000 into an IRA managed by Earls in 2014 or 2015.  The account was supposed to go to the

BROKER but VICTIM 10 never received any documents reflecting this.  Rather, VICTIM 10

began receiving notices from the IRS saying that he owed approximately $22,000 in taxes for

withdrawing the account instead of rolling it over.  VICTIM 10 sent the notices to Earls who

blamed it on the IRS's poor bookkeeping.  Eventually, VICTIM 10 stopped getting notices and

now believes that Earls paid the tax liability with VICTIM 10's money.  VICTIM 10 received

irregular statements purporting to be from BROKER and would repeatedly ask Earls to correct

the address on where the statements were sent.  For the last two or so years, VICTIM 10 had

tried to set up a meeting with Earls to discuss his investment, but Earls would come up with

excuses to not meet.  When VICTIM 10 contacted the BROKER about his account, BROKER

advised that they had two accounts with a total value of about $106,000.  VICTIM 10 believed

the total should be in excess of $140,000.

26.     VICTIM 10 also noted his observations about Robert and Diane Earls living

beyond their apparent means. He noted that Robert and Diane Earls would routinely travel to

Boston to see their daughter and paid for an extravagant wedding for her.  VICTIM 10 also

believes that Earls helped pay for his other daughter's house in Oak Island, North Carolina.

Robert Earls split up with Diane Earls in approximately 2019 after he dated various men for

several years prior.  Robert Earls would buy his boyfriends expensive gifts including cars and jewelry and spend a lot of money at Roanoke bars.  Diane and Robert Earls both told VICTIM 10 that Robert had no assets in his name after signing them over to Diane.  According to VICTIM 10, Robert Earls was not technically savvy, and VICTIM 10 does not believe that Earls executed the scheme to defraud the investors on his own. He believes that Diane Earls at least had knowledge of it.  VICTIM 10 stated that Diane Earls has moved to North Carolina and is working remotely for her employer in Roanoke.

27.     VICTIM 11 has known Robert and Diane Earls for over forty years.  VICTIM 11 invested $5,000 to open an account with Robert Earls in 2008.  After that, VICTIM 11 would send Robert Earls checks, usually through the U.S. Mail using stamped envelopes Robert Earls provided, approximately every two weeks that were payable to the BROKER.  These checks were typically in the range of $200-$400 and coincided with when VICTIM 11 was getting paid. Sometimes Robert Earls would not deposit the checks for several weeks, which required VICTIM 11 to call Robert Earls to remind him to cash the check.  In 2019 or 2020 VICTIM 11 transitioned to electronic transfers from his account to his investment through Robert Earls. After VICTIM 11 heard that Robert Earls had committed suicide and that his clients had issues with their accounts, VICTIM 11 contacted the BROKER.  It appeared that the electronic deposits were properly invested but that there was at least $32,000 missing from his account.  VICTIM 11 reviewed copies of checks that were deposited into Robert Earls's Southern Investment Strategies account at MemberOne Credit Union.  VICTIM 11 noted that someone had altered the payee in the checks and added "SIS" on the line on most of the checks.  I believe that Robert Earls added "SIS" to the checks in order to deposit them into his Southern Investment Strategies account.

28.     VICTIM 11 recalled that the Earlses had lavish parties and spent a lot of money traveling to Boston and on their daughters' living expenses.  For example, Diane Earls told VICTIM 11's wife that they paid rent on two apartments in the Boston area because the daughters said they could not live together.  Robert Earls also moved out and lived separately from Diane Earls for a time but moved back in with her a few years ago.  During the time Robert was separated from Diane, he spent a great deal of money on his boyfriends.  Over the years, VICTIM 11 and his wife would meet with the Earlses over dinner or drinks to discuss their investments.  Robert Earls would show them printouts of spreadsheets or spreadsheets on a laptop, but it was very clear he did not prepare them because he was not good with computers and because whenever VICTIM 11 or his wife had a question, or Robert Earls had an issue, Diane Earls would be the one to resolve the matter.

29.     The FBI interviewed Diane Earls at her residence on February 22, 2024.  When I arrived for the interview, I noticed a Nest video camera positioned near ground level close by the downspout on the garage.  The placement of this device was such that it would have pointed in the direction of the driveway and a portion of the short walkway leading to the driveway, as seen in the below image:



30.     In the interview, Ms. Earls confirmed that she was an active Certified Public Accountant and that Robert Earls was a financial advisor through the BROKER.  He maintained an office in the basement of the residence and kept records there.  He met a few of his clients at the house but most of the meetings were at restaurants.

31.     According to Diane Earls, Robert Earls was not technologically savvy and had difficulty with computers.   Robert Earls received periodic commission checks from the BROKER, but Diane Earls was the primary breadwinner for the house.  Diane and Robert Earls divorced because of Robert's brother, who Diane Earls described as mentally unstable.  Most of their joint assets were signed over to Diane Earls in the divorce agreement; however, the deed to the house remained in both of their names.  They still lived together, but Robert Earls made the mortgage payments on the house.

32.     After being advised that the FBI was looking into missing money that was being managed by Robert Earls, Diane Earls advised that she had no idea where the money went and noted that Robert always acted like he had no money.  Ms. Earls ended the interview shortly thereafter.

33.     On March 1, 2024, the Hon. Joel C. Hoppe, United States Magistrate Judge, authorized a federal search warrant for the Earls's residence. Pursuant to that warrant, the FBI conducted a search of the residence on March 5, 2024.  Among the items seized were records relating to VICTIM 1 and VICTIM 2, data from Diane Earls's cellular telephone and computer, and various electronics.   The FBI also located several handwritten pages, including the previously-referenced will, in Diane Earls's backpack.   Several of the pages reference the scheme to defraud Robert Earls's investors, including "A side note – I've been haunted by this day for years.  Never thought it would be so soon.  I'm out of my head (illegible) – See no other

options.  Sorry for all I've done to you."  Another page states "Well everyone will know you were never involved, nor (their daughters) in any way."  I believe that Earls included this verbiage to shield Diane Earls from her involvement in the scheme.  When the FBI interviewed Diane Earls on February 22, 2024, she stated that she had no idea why Earls killed himself.  In light of the documents found in her backpack, this statement appears to have been false.

34.    The FBI also located a physical list of online accounts with usernames and passwords in Robert Earls's belongings at the residence.  One of the accounts was for Nest and included a username of rjearljr@gmail.com and the associated password.  There is another account under Yahoo with an email address of robertearlsjr@yahoo.com.

35.    The FBI conducted a preliminary examination of the data from Diane Earls's cellular phone.  It appears that Diane Earls used two email accounts, dmearls@ymail.com and 2dianeearls@gmail.com, with the majority of the emails stored on the phone using dmearls@ymail.com.  There are hundreds of emails to and from robertearlsjr@yahoo.com using the dmearls@ymail.com address.   There are about twenty emails between robertearlsjr@yahoo.com and 2dianeearls@gmail.com.  One email sent from robertearlsjr@yahoo.com was sent on November 17, 2023, to dmearls@ymail.com and 2dianeearls@gmail.com with three attachments that appear to be three spreadsheets referencing VICTIM 1.  These attachments are entitled [VICTIM 1] update.xlsx, [VICTIM 1]2022(1).xlsx, and [VICTIM 1]2023.xlsx.  I believe these to be spreadsheets that Diane Earls created and emailed to and/or received from Robert Earls that were given to VICTIM 1 and that these spreadsheets will also be found in Diane Earls's email accounts. The FBI also recovered three documents from Diane Earls's cell phone that were all entitled attachment.xlxs and were created on November 17, 2023, and last accessed on November 29, 2023.  One references VICTIM 1's

trust and is dated November 17, 2023; one is dated January 15, 2021, and also references VICTIM 1's trust; and one is dated January 15, 2021, and also references VICTIM 1's trust but with a column added stating "Acquisition Date." These spreadsheets are very similar to copies of spreadsheets that VICTIM 1 provided to the FBI and that he said he received from Robert Earls. There are a few differences between the two versions, which I believe are the result of Diane and Robert Earls editing draft versions before giving the final version to VICTIM 1.

36.     The preliminary examination of the cellular phone also revealed text messages between Diane Earls and Robert Earls. There are numerous group texts involving Diane Earls and Robert Earls and others, but the only text exchange on the cellular phone between only Diane Earls and Robert Earls was on February 6, 2024—the day Diane Earls notified police that Robert Earls was missing. In this exchange of five messages that Diane Earls sends, Diane Earls asks Robert Earls if he was at Lewis Gale and if he was alright. There is no response from Robert Earls. However, a review of the phone's Log Entry data shows dozens of incoming and outgoing messages between Robert and Diane Earls going back to September 2023. Given this discrepancy, I believe that Diane Earls deleted all of the texts between the two of them and then sent the texts referenced above. It also appears Diane Earls deleted text exchanges with her two daughters. However, it appears that the deleted texts with Robert Earls were not completely deleted but were also captured under her 2dianeearls@gmail.com profile on her phone. A cursory review of these deleted texts reveals over 9,000 exchanges between Diane Earls and Robert Earls going back to October 2020. These older text messages between Diane and Robert Earls are likely to be on Robert Earls's phone.

37.     The FBI secured banking records for Robert Earls from 2014 through the present. Those records show voluminous activity in his accounts at MemberOne Credit Union. He kept a

personal account in his name and a business account that appears to have been set up in the name of the BROKER with a reference to a business called Earls Investment Services in 2005. The records show that, in approximately 2011, the account was renamed to Southern Investment Strategies. The FBI is currently conducting a complete financial analysis of these accounts and Robert Earls's accounts at Truist Bank and Pinnacle Bank.

38.     A preliminary analysis of the bank records shows a great deal of evidence of Robert Earls's criminal activity. For example, there are regular deposits of checks into the MemberOne account from the Town of Stuart, representing VICTIM 7's retirement contributions to a plan that Earls was supposed to have been managing and investing for her. There are also individual checks from VICTIM 7 that Earls was supposed to have been investing for her. There are regular checks from VICTIM 11 that Earls was supposed to have been investing for him. There are also multiple large deposits from VICTIM 1 and VICTIM 2's trusts that Earls was supposed to have been managing and investing for them. There are checks from VICTIM 4 that Earls was supposed to have been investing for her. There are checks from VICTIM 5 and VICTIM 6 that Earls was supposed to have been investing for them. There is a check for $12,000 from a church that Earls was supposed to have been investing. There is no evidence that Earls invested any of this money. Rather, the bank records show that Earls spent all the money the victims "invested" with him on a lavish lifestyle for himself, Diane Earls, his daughters, and other individuals. Earls routinely spent over $15,000 per month on his various credit card bills with most months being well in excess of this. He also spent a large amount of money on the mortgage payment on the residence he shared with Diane Earls. Robert Earls did receive occasional wires in from the BROKER for commissions. For 2022, it appears that he received $42,319.47 in wires from the BROKER.

39.     Below are examples of Earls's fraudulent transactions and money laundering.

40.     On May 1, 2019, a $25,000 check from VICTIM 1 was deposited into the Southern Investment Strategies account.  It was followed by a $21,000 transfer from Southern Investment Strategies to Earls's personal account at MemberOne on May 14, 2019.  The very next day, on May 15, 2019, Earls's personal account was used to make a $1,313.34 ACH payment to Nationstar d/b/a Mr. Cooper.  Mr. Cooper appears to service the mortgage for the Earls's Roanoke residence.  This transfer was followed by a $6,239.77 payment to AMEX, a second $9,178.03 payment to AMEX, and a $600 ATM cash withdrawal.

41.     On July 23, 2020, a $45,000 check from VICTIM 1's mother's trust was deposited into the Southern Investment Strategies account at MemberOne.  It was immediately followed by a $25,000 transfer from Southern Investment Strategies to Earls's personal account at MemberOne. The following day, on July 24, 2020, Earls's personal account made a $1,325.82 ACH payment to Nationstar d/b/a Mr. Cooper.  Later that day, there was also a $1,468.82 payment to Capital One, a $2,500 payment to Chase Credit Card, three separate payments to AMEX (totaling $14,204.71), and a $600 ATM cash withdrawal.

42.     On November 3, 2020, a $12,000 check from VICTIM 5 and VICTIM 6's church was deposited into the Southern Investment Strategies account at MemberOne.  It was followed by a $1,000 transfer from Southern Investment Strategies to Earls's personal account at MemberOne on November 4, 2020; a $5,000 transfer on November 5, 2020; and a $3,200 transfer on November 8, 2020.  Robert Earls also conducted a $600 ATM withdrawal from the Southern Investment Strategies account after the deposit.  These transfers were followed by a $1,416.87 ACH payment to Nationstar on November 5, 2020, from Earls's personal account at MemberOne.  Additionally, Earls made a $100 payment to Capital One on November 5, 2020; a

$200 payment to Capital One on November 5, 2020; a $251.71 payment to Chase Credit Card on November 5, 2020; a $600 payment to Chase Credit Card on November 6, 2020; a $610.54 payment to AMEX on November 6, 2020; a $5,427.25 payment to AMEX on November 9, 2020; and a $600 cash withdrawal on November 5, 2020, all from his personal account at MemberOne.

43.     These transactions, and other similar such transactions, indicate that Robert Earls deposited client funds to be used for client investments into his business account and then moved substantial portions of those funds to his personal account for his own personal use.

44.     The FBI made contact with the BROKER, which advised that they were investigating this matter after having been contacted by two of Robert's clients.  Both clients provided statements that were purportedly from the BROKER.  These statements were not approved by the BROKER, and the BROKER believes that Robert Earls created the statements for the clients.

45.     To date, as detailed in this affidavit, there is probable cause to believe that Diane Earls participated in Robert Earls's criminal conduct. Specifically, the evidence indicates that Diane Earls may have created spreadsheets containing false information about client accounts. She answered questions from multiple victims and Robert Earls about the contents of the spreadsheets, indicating her knowledge of, and participation in, the fraudulent scheme. Multiple persons, including CW 1 and Diane Earls, indicated that Robert Earls was not good with computers, suggesting that she was the most likely person to have doctored fraudulent account statements purporting to be from BROKER. Spreadsheets related to VICTIM 1 were found on Diane Earls' phone. And Diane Earls appears to have engaged in deceptive conduct potentially suggestive of consciousness of guilt. For example, she made apparently false statements to law

enforcement, claiming that she had no idea why Robert Earls killed himself. And she appears to have deleted her text messages with Robert Earls on the day that she reported him missing.

46.     My investigation indicates that the Nest camera likely captured evidence of the Target Offenses.  Specifically, on or about February 11, 2024, VICTIM 1 and his wife saw Diane Earls taking papers out of Robert's car and giving them to Diane Earls's daughter and son-in-law.  And the Nest camera likely also captured the events before and after Robert Earls's suicide, the FBI interview of Diane Earls, and the FBI search warrant at the former Earls residence in Roanoke.  For that reason, I believe that there is probable cause that the information in Attachment A will contain evidence of the Target Offenses, as further detailed in Attachment B.

47.     The FBI submitted preservation requests for account information corresponding to this account on March 5, 2024; May 16, 2024; and August 14, 2024, pursuant to 18 U.S.C. § 2703(f).

## BACKGROUND CONCERNING NEST

48.     From my review of publicly available information provided by Nest about its services, including Nest's "Privacy Policy" and "Terms of Service," I am aware of the following about Nest and about the information collected and retained by Nest:

   a.   Nest sells products and services designed to see, hear, and speak through video recording and transmitting devices via the customer's computer or mobile device, such as the video camera utilized at the Earls residence.

   b.   Google Nest cameras and doorbells can detect sound or motion ("events"), record and stream live video of these events, and save the video to the cloud. Video recording will ordinarily include audio, and a Nest video device may record video and audio for a designated period after being triggered by an event. Videos can be

as short as 10 seconds, or as long as three minutes, depending on the event and the user input.

c. The duration that videos are retained by Nest depends on the camera and subscription utilized by the end user. For example, video "event history" can be maintained for up to three hours for non-paying users, up to 30 days with a "Nest Aware" subscription, and up to 60 days for a "Nest Aware Plus" subscription. At any time during the retention period, a user may delete a video.

d. Nest asks customers to provide personal information in connection with Nest products and services. This may include: contact information, such as name, phone number, email, and postal address; account information, such as online password and other log-in details used to access Nest products and services, and payment information.

e. Nest also obtains the geolocation of customers' mobile devices if such customers consent to the collection of this data. For example, Nest can utilize location data to determine whether the user is home or away.

f. Nest also obtains product setup information, including the name and description of the Nest product and location where it is installed, technical information about the product, including Wi-Fi network information and signal strength, and information about the device's model, serial number, and software version.

g.  Certain Nest products can also be enabled to recognize facial characteristics of familiar visitors. If the customer activates this feature, the customer asks the Nest product to recognize visitors as either familiar or unknown. Nest then obtains certain facial feature information about those visitors.

49.     Multiple user accounts can be associated with Nest devices. For example, Nest permits shared access with varying levels of permissions to users: "Owner," "Full access," and "Home entry only." Given that Diane Earls had the Nest app installed on her phone, and that Robert Earls listed login information associated with his email, there is reason to believe that emails associated with both individuals may be linked to the relevant Nest information.[1]

50.     Information stored in connection with a Nest account may provide evidence of the "who, what, why, when, where, and how" of the Target Offenses under investigation, thus enabling the FBI to establish and prove each element or alternatively, to exclude the innocent from further suspicion.   In my training and experience, captured video and audio contents, images, comments, and other data collected by Nest products about the surrounding environment can be evidence of who was present at a particular physical location at a relevant time. This geographic and timeline information may tend to either inculpate or exculpate the Nest account owner or others connected to the crime.

51.     Based on the information above, Nest's servers are likely to contain the types of material described above, including stored video and audio content and information concerning the use of Nest products and services by Robert Earls, Jr.; Diane Earls; and email addresses 2dianeearls@gmail.com, robertearlsjr@yahoo.com, or rjearlsjr@gmail.com. In my training and experience, such information may constitute evidence of the Target Offenses, including information that can be used to identify the account's user or users.

---

[1] To date, bank records received in this investigation do not show any transactions suggestive of a Nest subscription. However, I know that Nest subscriptions can be paid for via credit cards, Apple Pay, and other types of payment methods, the records of which I do not presently have access to.  I also know that the functionality of a Nest device is significantly degraded without a subscription.  For example, a nonpaying customer only gets three hours of "event history" for a device, which reduces any utility in possessing a Nest video camera.  Therefore, I believe it to be more likely that Robert and/or Diane Earls had a subscription to allow for longer retention of videos.

## CONCLUSION

52.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of the Target Offenses, as further described in Attachment B, may be located in the information described in Attachment A.  Specifically, there is probable cause to believe that the Nest camera in use at the Earls residence recorded (1) the events shortly before and after the death of Robert Earls, which was precipitated by VICTIM 1's ultimatum that he would go to the BROKER on or about February 5, 2024; (2) the events on or about February 11, 2024, in which VICTIM 1 and his wife saw Diane Earls transferring papers from Robert Earls's car and giving them to family members; (3) the events shortly before and after the FBI's interview of Diane Earls on February 22, 2024; and (4) the events before and after the FBI's search warrant at her residence on March 5, 2024. Given the placement of the Nest camera, and the ordinary operations of these devices, as discussed above, it is likely that this device captured evidence (video, audio, or both) pertaining to these events.  Because the FBI preserved data from Nest, there is also probable cause to believe that the recordings from these devices remain intact.  I request that the Court issue the proposed search warrant.

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Nest.  Because the warrant will be served on Nest, who will then compile the requested records at a time convenient to it, and then reviewed by government-authorized persons, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

RICHARD A. MILLER
Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and sworn and subscribed to me by telephone on this 29 day of ___August___, 2024.

HON. C. KAILANI MEMMER
UNITED STATES MAGISTRATE JUDGE

25